Chambers Estate.

Argued October 9, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Stephen I. Richman,* with him *Greenlee, Richman, Derrico & Posa,* for appellant.

*Jonathan Allison,* with him *Schmidt, Allison & Townsend,* for appellee.

OPINION BY MR. JUSTICE JONES, March 25, 1970:

James B. Chambers (testator) left a will creating a trust, the income of which was to be paid to his daughter, Hazel McGill, for her life. After Hazel's death, the income was to be distributed as follows: "Upon her death I direct the income to be paid to her children, if any, and for and during their lives."

This appeal requires a determination of the circumstances, if any, under which testator's grandchild, who was adopted after testator's death, may share in the bequest to the "children" of testator's daughter.

On December 6, 1929, Hazel, who had been married for twelve years but could have no children of her own, adopted a son, Paul McGill. Hazel's father, James B. Chambers, executed his will on December 12, 1930, including the bequest to Hazel's "children, if any." Paul McGill died from an accident in September, 1931, and on May 6, 1933, the testator died. The appellant, William McGill, was adopted by Hazel on October 19,

24

1937. Until her death on May 2, 1966, the trust income was distributed to the appellant's mother, Hazel McGill, and, after her death, the sum of $625, representing unpaid accrued income from the trust up to June 1, 1966, was paid to the appellant. Thereafter, the appellant obtained a citation from the Orphans' Court requiring the trustee to show cause why the future trust income should not be paid to him. After a hearing, appellant's petition was dismissed. From that decree appellant took this appeal.

Under the Wills Act of 1947, P. L. 89, §22, 20 P.S. §180.22, the will of any person who died prior to January 1, 1948, is governed by the Wills Act of 1917. The presently pertinent portion of the 1917 Act reads as follows: "Whenever in any will a bequest or devise shall be made to the child or children of any person other than the testator, without naming such child or children, such bequest or devise shall be construed to include any adopted child or children of such other person who were adopted before the date of the will, *unless a contrary intention shall appear by the will.*" Act of June 7, 1917, P. L. 403, §16(b), 20 P.S. Ch. 2, App. §228 (emphasis added).

Although the section does not explicitly pertain to after-adopted children, this Court has stated that the effect of this rule of construction is to exclude from a bequest to "children" of a person other than the testator, a child who was adopted after the will was executed. *Holton Estate,* 399 Pa. 241, 247, 159 A. 2d 883, 886 (1960). However, artificial rules of testamentary construction have been legislatively and judicially created merely to aid in what is always the primary goal— to ascertain and to give effect to the testamentary purposes of the testator. Therefore, where the testator's actual intent can be ascertained, such intent must prevail over any artificially-deduced "intent" which the rules of construction might dictate. *Id.* at 244, 159 A.

2d at 885. We will only resort to such rules of construction if the will is unclear or the testator's actual intent is uncertain. *Houston Estate,* 414 Pa. 579, 586, 201 A. 2d 592, 595 (1964).

The intent of the testator may be gathered from a consideration of four items: the language of the will itself, the scheme of distribution, the factual situation as of the date of execution of the will, and the existing factual situation. *Id.* (and cases cited therein). In the case at bar, unimpeached and uncontradicted evidence was presented at the hearing which indicated: that Hazel McGill could not have children and, therefore, adopted Paul; that this fact was common knowledge in the community of about 1,300 people; that the testator was a leading figure in the area and was well aware of local affairs; that the testator was very close to his daughter, Hazel, and doted upon his adopted grandson, Paul; and that the testator did, in fact, know that Paul had been adopted and that Hazel could bear no children of her own.[1] In short, the appellant's evidence clearly established that when James B. Chambers executed his will he *knew* that Hazel could have no children and that she had adopted Paul. The appellee presented no evidence bearing on this question.[2]

_____

[1] Among the many witnesses who testified to these facts, either by sworn affidavit or by testimony, were: Kay Ghrist, a close friend of Hazel and James McGill; A. M. Struzka, Sr., a former employee of the testator; John McKain, a close friend of the testator; Virginia Dickinson, a close friend of both Hazel McGill and the testator; and Maude Braiden, the testator's widow.

[2] The appellee has objected to the evidence as being hearsay and, therefore, inadmissible. Certain portions of some of the affidavits consisted of statements by the declarant as to what he had been told by another. We have, of course, excluded these sections from our consideration. However, the crux of most of these statements was to the effect that it was a matter of common knowledge throughout this small community that Hazel had adopted Paul and that she could have no children of her own. To this extent, the

We return, now, to the will itself wherein a bequest is made to Hazel's "children." Because of the factual situation in 1930, when the will was written, the only natural interpretation that could conceivably be given this bequest is that the testator intended to provide for his adopted grandson, Paul McGill, and for any other children adopted by Hazel in the future. Any other explanation would not only be absurd under the facts of this case, but would render the bequest nugatory. A testator is presumed not to have included mere surplusage in his will. *Benedum Estate*, 427 Pa. 408, 415-16, 235 A. 2d 129, 133 (1967). By his use of the plural noun, "children," the testator evidenced an intent to include in his bequest any child or children which Hazel might have in addition to the one child, Paul, who had already been adopted. Since the testator knew that Hazel could *only* have additional children by adoption, he *must* have intended to provide for these children. The provision for Hazel's "children" makes utterly no sense unless it was intended to include after-adopted children.

The court below relied upon the following language from *Holton Estate,* 399 Pa. 241, 247, 159 A. 2d 883, 886 (1960), as dispositive of the instant case: "An examination of this statute clearly reveals the legislative intent: to *include* within the term 'child' or 'children' of a person other than the testator an adopted 'child' or 'children' provided, however, that such adoption took place before the execution of the will, and to *exclude* such adopted child or children if the adoption took place after the execution of the will." However, we made it perfectly clear in that case that a prerequisite

---

statements were merely stating a known fact and did not constitute hearsay. We also note that some of the testimony explicitly stated the fact that James B. Chambers knew of Hazel's condition. This, too, would not be hearsay.

to the application of the quoted rule is the *absence* of any indication of what was the testator's *actual* intent. In *Holton Estate*, we found *no* such indication on the following facts: the will provided for the testator's son, Howard, and for Howard's children; Howard's wife, not Howard, was incapable of having children; and, no children were adopted by Howard until almost four years *after* the testator's death. On those facts, it would be equally plausible to either find that the testator did or that he did not intend to include adopted children in his will. Accordingly, we were forced to resort to the legislative rule of construction in the Act of 1917.

Fortunately, in the case at bar we have ample evidence from which to ascertain the testator's actual intent. There are three factors present in the instant case which require us to reach a different result from the *Holton* case. First, *as the testator knew,* Hazel herself was incapable of bearing natural children, not, as in *Holton,* her spouse.[3] Second, Hazel had already adopted one son at the time that the will was executed. Third, Hazel and her father had a very close relationship, and she and her son spent a great deal of time with the testator. All these facts make it clear that the testator in the instant case was a concerned and devoted father and grandfather who wished to provide for Hazel's children, regardless of any *legal* distinctions drawn between relationship by adoption and relationship by blood.[4] William James McGill is entitled to take under his grandfather's will as one of Hazel McGill's "children."

Decree reversed; costs on the estate.

---

[3] In *Holton,* it was possible that Howard might remarry and then have natural children.

[4] *Cf. Fownes Trust,* 421 Pa. 476, 481-82, 220 A. 2d 8, 11-12 (1966) (dissenting opinion).

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Is a child *adopted by the testator's daughter after the death of the testator* entitled to receive income from his testamentary trust which, after his daughter's death, he bequeathed to her *children, "if any"*?

James B. Chambers, the testator, died on *May 6, 1933,* leaving a *will dated December 12, 1930.* He was survived by his widow and one child, his daughter, Hazel Chambers McGill. Hazel was born November 1, 1892, and was married to James S. McGill on December 29, 1917. Hazel had no natural children, but in 1929, *over a year before Chambers executed his will* and a little over three years before the death of her father, Hazel and her husband adopted a boy child who was given the name Paul McGill. In September 1931, Paul was kicked by a horse and died at the age of two years and four months. In the succeeding year and eight months before testator's death, he never changed his will. Four years and five months *after testator's death,* his daughter Hazel and her husband, on October 19, 1937, adopted this appellant, William James McGill.

Appellant's claim arises under and out of the fourth paragraph of testator's will:

"Fourth: I hereby give, devise and bequeath to The James B. Chambers Memorial Association of Ohio County, West Virginia, the sum of Fifty Thousand ($50,000.00) Dollars to be . . . held by them in trust . . . for the following uses and purposes: a. To invest and reinvest the same in any securities that they may deem proper . . . and to collect and pay over the income which shall be derived therefrom, semi-annually, to my daughter, Hazel G. McGill . . . during her life. *Upon her death, I direct the income to be paid to her children, if any,*\* and for and during their lives. [There

---

\* Italics throughout, mine, unless otherwise noted.

then follows a spendthrift trust provision.] After the death of my said daughter and *her children, if any,* my said Trustee shall . . . deliver the corpus of the said trust fund of $50,000.00 to the James B. Chambers Memorial Association . . . to be its property and possession absolutely."

The income was paid to his daughter Hazel to the time of her death on May 2, 1966. After her death, the appellant obtained a citation from the Orphans' Court requiring the trustee to show cause why the future trust income should not be paid to him. After a hearing, appellant's petition was dismissed, and from that decree appellant took this appeal.

The Legislature in the Wills Act of 1917, §16(b) (Act of June 7, 1917, P. L. 403, 20 P.S. Ch. 2, App. §228), provided: "Whenever in any will a bequest or devise shall be made to the child or children of any person other than the testator, without naming such child or children, such bequest or devise shall be construed to include any adopted child or children of such other person *who were adopted before the date of the will unless a contrary intention shall appear by the will."* An examination of this statute clearly reveals the legislative intent: to *include* within the term "child" or "children" of a person *other than* the testator, an *adopted* "child" or "children," *provided* that such adoption took place *before* the execution of the will, and to *exclude* such adopted child or children if the adoption took place *after* the execution of the will, unless a contrary intention shall appear by the will.

It is a general rule that a testator's intent is the polestar in the interpretation of every will, and that the testator's intent, if it is not unlawful, must prevail. *Houston Estate,* 414 Pa. 579, 201 A. 2d 592; *Cannistra Estate,* 384 Pa. 605, 607, 121 A. 2d 157.

This was a will, well-drawn by a lawyer. The burden in this case was undoubtedly on the appellant,

who (we repeat) was adopted by testator's daughter more than four years after testator's death, to prove that the testator clearly intended to include him in and *by the language of his will,* in order to avoid the aforesaid provision of the Wills Act which excluded him unless the testator, *by his will,* provided otherwise.

When Chambers' will was drawn, he knew that his daughter had one adopted child and no natural children, and, under our law, he is presumed to have known, when he executed his will, the mandatory requirements and provisions of the Wills Act with respect to children adopted by a person other than the testator. Cf. *Mayer's Estate,* 289 Pa. 407, 411, 137 Atl. 627; *Linn Estate,* 435 Pa. 598, 604, 258 A. 2d 645; *Lusk's Estate,* 336 Pa. 465, 467, 9 A. 2d 363. When, therefore, testator gave his income to his daughter's "children, if any," there is not the slightest statement, or even indication, that he intended to give it to her adopted child, "if any." This is reinforced by the fact that testator did not give his income to his daughter's "adopted child or children," or even, as every well-drawn will would have provided, to her "surviving children," or to her "then living children," or to her "children who are living at her death," but instead to her "children, *if any,* and for and during their lives. . . . [and] after the death of my said daughter and her children, *if any* . . . ." It is clear from the language of his will and the aforesaid facts and circumstances— assuming they are admissible (see infra)—that testator did not intend to give his income to his daughter's known adopted child, and certainly not to this unknown and subsequently adopted appellant.

The Majority make several major mistakes, each of which is fatal to their interpretation of the will—(1) they disregard the pertinent language of the Wills Act, (2) they admit and rely upon facts and circumstances including gossip and hearsay testimony which are in-

admissible and uncontrolling and (3) most important of all, they blindly ignore the recent decisions of this Court which are directly in point and unquestionably controlling.

## Prior Decisions

If there were any doubt about the construction of this will and the interpretation and determination of the testator's intent *in the light of the clear language of the Wills Act,* it would be completely removed by the prior decisions of this Court which, without any doubt, control the interpretation of this will. While it is rare that any will has a twin brother, we have in this case both a brother and a twin brother—*Holton Estate,* 399 Pa. 241, 159 A. 2d 883, and *Jaekel Estate,* 424 Pa. 433, 227 A. 2d 851. In each of these cases the Opinion was written by Mr. Justice JONES, and both of these cases are controlling and their language and decisions cannot be ignored or extirpated.

In *Holton Estate,* 399 Pa., supra, testator created a trust in his will dated March 16, 1929, in which he provided for the payment of the net income to his son, Howard, for life and "at his death and until the expiration of twenty-one years" therefrom, "to divide the net income . . . into as many parts . . . as there shall be *children of [Howard]* living at the quarterly distribution periods . . .," with subsequent gifts of principal to children, issue and descendants.

Testator's son, Howard, was married approximately twelve years before his father's death on April 26, 1931, but he and his wife had no natural children.* *After testator's death, Howard and his wife adopted two children,* both of whom survived Howard upon his death in 1957. *This Court denied the claim of these*

---

* It was *proved* that Howard's wife was incapable of having children.

*adopted children* that they were entitled to the income under the above-quoted provision of the trust, and pertinently said (pages 246-247, 248) :

"Our examination of this will reveals no intent, expressed or implied, that the testator contemplated either the inclusion in or the exclusion from the word 'children' of adopted children. The will is silent on the subject.

"Our next inquiry is the impact, if any, of the Wills Act of 1917, supra, on the construction and interpretation of this will. [It then quotes the above-mentioned provision of §16(b) of the Wills Act.] In Corr's Estate, 338 Pa. 337, 12 A. 2d 76, this Court considered a somewhat analogous situation. Corr died in 1912 leaving a will executed in 1906; he created a testamentary trust for his daughter for life and gave her a power to appoint among her 'children and descendants of children'; he provided a gift over if she died 'leaving no children or descendants of children'. The daughter had no natural children but adopted a son in 1930, eighteen years after Corr's death. The daughter's attempt to exercise her power of appointment in favor of her adopted son was held invalid. This Court stated (p. 340) : 'Prior to the passage of the Wills Act of June 7, 1917, P. L. 403, it was the established rule that adopted children could not participate in testamentary gifts to "children": [citing cases]. As the testator died five years before the effective date of the Wills Act, this is the rule that must govern the interpretation of his will. *But even if the Wills Act [1917] were applicable here, Seidle's position would be no better, because that statute modifies the former rule of construction only as to persons adopted before the execution of the will. See Section 16(b) of the Wills Act.'***

. . .

___

** Italics in *Holton Estate.*

" 'The Wills Act of 1917 changed the prior case law by providing that, *in the absence of a contrary intent appearing in the will,* (1) a gift to testator's children would include any child adopted by him; and (2) a gift to the children of another would include any child *adopted before* the will was executed. *If the child were adopted by someone other than the testator after the will was executed (even though before the testator's death), he was still excluded under the act of 1917.*' Bregy, Intestate, Wills and Estates Acts of 1947, pp. 3154, 3155."

### A Contrary Intention Must Be Ascertained from the Will Itself

Probably the biggest mistake made by the Majority is their ignoring of *Jaekel Estate,*\* 424 Pa., supra, which is directly in point and controlling and isn't even mentioned by the Majority. It wipes out the standards and criteria upon which the Majority rely and fixes the law in accordance with the clear language of the Wills Act, which the Majority have overlooked or ignored. In *Jaekel Estate,* which involved the question of whether the decedent's daughter exercised her power of appointment, the Court said (pages 437, 438-439): "This statute [Wills Act of 1947, Act of April 24, 1947, P. L. 89, §14(14), 20 P.S. §180.14] presently controls. Section 14(14) provides that: '*In the absence of a contrary intent appearing therein,*\*\* wills shall be construed as to real and personal estate in accordance with the following rules: . . . .'

---

\* A unanimous Opinion of the Court written by Mr. Justice JONES.

\*\* Italics in *Jaekel Estate.* It is very important to note that this phrase is practically identical with the phrase in the Wills Act of 1917, supra, and the same interpretation thereof must follow.

"The burden of demonstrating with clarity that the donee-testator has manifested *a contrary intent in the will*** is placed upon those who challenge the exercise of the general appointive power: Thompson v. Wanamaker's Trustee, 268 Pa. 203, 214, 110 A. 770 (1920).

"Moreover, this 'contrary intent' must 'appear' in the will itself. In Provident Trust Co. of Philadelphia v. Scott, 335 Pa. 231, 6 A. 2d 814 (1939), this Court stated: 'This [the 1917 statutory] presumption may be overcome, moreover, only by the presence in the will of language clearly indicative of a contrary dispositive intent, or of a form or method of disposition inconsistent with an exercise of the power. *The contrary intent must appear from the will itself, not from extraneous circumstances.*** This appears from the words used in the statute and from the decisions which have construed it: [citing authorities].' (at p. 235) (Emphasis supplied). In Thompson v. Wanamaker's Trustee, 268 Pa. 203, 214, 110 A. 770 (1920), it was stated: '. . . the rule is ordained that he who, in any instance, denies that a general devise executes a general power of appointment, must prove "by what appears on the face of the will" that it was testator's "clearly expressed" intention the devise in question "should not do so". [citing authorities].' From an examination of the statutory language it is clear beyond question that the 'contrary intent' required to rebut the statutory presumption of the exercise of the power of appointment must appear in the will itself; unless within the four corners of the will such 'contrary intent' can be demonstrated, application of the statutory presumption is mandated."

The Court then analyzed and reviewed the conflict of prior decisions in this Court and in the Courts of our sister States, and in summary said (pages 444,

---

** Italics in *Jaekel Estate*.

445): "In In Re Deane's Will, 4 N.Y. 2d 326, 175 N.Y.S. 2d 21 (1958), the Court of Appeals, construing the provisions of the New York statute, held that the presumption provided by that statute could be rebutted 'only by the express language or the necessary implication of the express language of the will itself.' (p. 332) and the Court refused to permit consideration of any evidence *dehors*\*\* the will as to the donee's statements of intent or the family background and proof of the relations between the party [sic], stating: '. . . the proof to rebut the statutory presumption must be found in the will itself, as the statute expressly says, and there was nothing in this will to that effect.' (p. 333). See also: In Re Estate of Hopkins, 46 Misc. 2d 273, 259 N.Y.S. 2d 565 (1964).

"The language of §14(14) of the Wills Act, supra, is clear beyond question. Therein the legislature has provided *explicitly*\*\* that the statutory presumption shall prevail unless a contrary intent appears in the will itself. *Under this legislative mandate we seek to find a contrary intent not in any facts or circumstances outside the will itself; our search is limited to the four-corners of the will.* By reason of the terms of this statute we are confronted with a situation where we cannot adopt the usual 'arm chair approach' in the construction of the will.

. . .

"The very able judge in the court below did consider extrinsic evidence as an aid in construction of the instant will; in this respect the court below erred."

The Majority have made several additional mistakes, *each of which is fatal* to their desired interpretation. They transform and pervert "gossip of friends" and "common knowledge" into *knowledge on the part of the testator* (the daughter's father); there was *no direct*

---

\*\* Italics in *Jaekel Estate*.

testimony that testator knew or believed that his daughter could not have any natural children! Furthermore, the testimony as to the testator's *unproved knowledge* amounted at best only to "hearsay gossip," and this hearsay gossip is inadmissible even by a Procrustean stretch of the "pedigree or family history" exception.

The second additional error is that the Majority ignore what is *really* common knowledge—that a wife can and frequently does, ten years or more after marriage, have one or more children by her (same) husband when the previous belief by her and among her family and friends was that she was incapable of having any children. Cf. *Dickson Estate,* 378 Pa. 48, 50, 105 A. 2d 156.

Finally, the Majority place great reliance on the word "children," when his daughter had only *one* child and that child was subsequently adopted. How the word "children" aids the Majority's interpretation when there was no adopted child at testator's death, and only one child (and that one adopted) at his daughter's death, passes my comprehension. Moreover, if the testator at the time he drew his will had meant and intended to include in his gift his daughter's *adopted* child Paul, why would he have said "children, *if any*"?

## Summary

To summarize: The Majority, in relying on extraneous factors and hearsay assumptions in attempting to ascertain the testator's intent, completely and utterly ignore *Jaekel Estate,* 424 Pa., supra, which (a) requires in accordance with the Wills Act *a contrary intent* to be disclosed by the testator and (b) requires that such intent must be ascertained and determined solely by and from the will itself. Moreover, assuming that extraneous evidence of facts and circumstances existing at the date of a will and subsequently thereto may

properly be considered in ascertaining a testator's intent in this class of case, the Majority misconstrue the true meaning and intent of testator's will and blindly ignore the aforesaid controlling cases. I can only conclude that a majority of this Court seem to believe that a testator's intent is ascertained and determined by what they think he meant to say or should have said, but didn't.

Mr. Justice COHEN and Mr. Justice EAGEN join in this dissenting Opinion.